# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

BRIAN HAWKINS,

              Petitioner,          :   Case No. 3:19-cv-072

    - vs -                          District Judge Thomas M. Rose
                                       Magistrate Judge Michael R. Merz

TIMOTHY SHOOP, Warden,
  Chillicothe Correctional Institution
                              :
              Respondent.

---

# REPORT AND RECOMMENDATIONS

This is a habeas corpus case brought *pro se* by Petitioner Brian Hawkins pursuant to 28 U.S.C. § 2254. Hawkins seeks relief from his convictions for rape and kidnapping in the Common Pleas Court of Montgomery County, Ohio. The case is ripe for consideration on the Petition (ECF No. 3), the State Court Record (ECF No. 10), the Return of Writ (ECF No. 11), and Petitioner's Reply (ECF No. 18).

## Litigation History

Hawkins was indicted in May 2015 for the July 2002 rape and kidnapping of A.J., a person then fifteen years old. After his motion to dismiss for lack of a speedy trial was denied, Hawkins was convicted by a jury. The trial judge then merged the rape and kidnapping counts and sentenced him to ten years' imprisonment.

1

Hawkins appealed to the Second District Court of Appeals which affirmed the trial court judgment. *State v. Hawkins*, 2018-Ohio-867 (Ohio App. 2nd Dist. Mar. 9, 2018), appellate jurisdiction declined, 153 Ohio St.3d 1453, 2018-Ohio-3026 (2018). On June 11, 2018, Hawkins filed an Application to Reopen his direct appeal to raise nine assignments of error the omission of which allegedly constituted ineffective assistance of appellate counsel. On July 11, 2018, he filed another such application with eleven omitted assignments of error. The Second District dismissed both of these as untimely and Hawkins did not appeal to the Supreme Court of Ohio.

While the direct appeal was pending, Hawkins filed a petition for post-conviction relief under Ohio Revised Code § 2953.21. That petition remained pending when the Return of Writ was filed here on August 14, 2019 (ECF No. 11, PageID 2241).

Hawkins' Petition here, purportedly mailed March 11, 2019, pleads the following grounds for relief:

> **Ground 1:** The trial court erred in overruling Mr. Hawkins' motion to dismiss, as the thirteen year [sic] pre-indictment delay caused actual prejudice to his right to a fair trial; thus violating his due process rights.
>
> **Supporting Facts:** Thirteen year [sic] pre-indictment delay, without new evidence.
> Prosecutor claimed original casefile, mental health and hospital records missing.
> Witnesses deceased and/or unavailable.
> Alleged victim not remember incident [sic] and provided inconsistent testimony.
>
> **Ground 2:** The trial court erred in finding Mr. Hawkins guilty of rape and kidnap as the convictions are against the manifest weight of the evidence.
>
> **Supporting Facts:** Physical evidence supports events as described by petitioner.
> Alleged victim not remember incident [sic] and provided inconsistent testimony.
> Court cut short defendant-petitioner's testimony.

Counsel failed to provide notes of investigator's conversations with alleged victim, subsequently hindering trial counsel from effective cross-examination

**Ground 3:** The cumulative effect of errors deprived Mr. Hawkins of a fair trial warranting a reversal under the cumulative error doctrine.

**Supporting Facts:** Thirteen year [sic] pre-indictment delay, without new evidence.
Inconsistent testimony.
Court violated state statutes and rules of evidence.
Prosecutorial misconduct, including manipulation, fabrication and loss of evidence/*Brady* violation.
Ineffective assistance of counsel.

**Ground 4:** Hawkins' convictions were based upon insufficient evidence.

**Supporting Facts:** No physical evidence.
Alleged victim not remember incident [sic] and testimony inconsistent and inconclusive with itself.
Withheld exculpatory *Brady* material.
Prosecutorial misconduct manipulated and fabricated evidence.
Alleged crime scene viewed by jury had significantly changed after thirteen years.
Exculpatory evidence withheld.

**Ground 5:** Hawkins' counsel provided constitutionally ineffective assistance under the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution and Article I, Sec. 10 and 16 of the Ohio Constitution.

**Supporting Facts:** Trial counsel failed to call alleged victim to testify at hearing of motion to dismiss; erred requesting for jury viewing of alleged crime scene that had significantly changed after thirteen years; failed to argue for relevant exculpatory evidence; failed to provide specific notes in order to effectively cross-examine key witness; failed to object to court's violations of state statutes and rules of evidence; failed to object to many instances of prosecutorial misconduct.

**Ground 6:** The trial court denied Hawkins his right to due process and a fair trial in violation of the Fifth and Fourteenth Amendment to the United States Constitution and Article I, Sec. 16 of the Ohio Constitution.

**Supporting Facts:** Trial court permitted viewing of alleged crime scene that had significantly changed after thirteen years; cut short the testimony of defendant-petitioner in pretrial motion to dismiss

hearing, as well as during trial; violated Ohio statutes and rules of evidence.

**Ground 7:** Prosecutor misconduct so infected these proceedings with unfairness as to make the resulting conviction a denial of due process.

**Supporting Facts**: Prosecutor withheld exculpatory evidence, violating *Brady*; misrepresented evidence; produced false evidence.

**Ground 8:** Appellate counsel was ineffective for failing to present issues not fully considered that should have been that prove an unreliable process was used to obtain a wrongful criminal conviction prejudicing appellate [sic].

**Supporting Facts:** Appellate counsel failed to properly and thoroughly demonstrate in detail issues as well as dead bang winning issues specifically requested by defendant-petitioner that show due process violations were used to unconstitutionally convict defendant-petitioner, inter alia: trial counsel was unprepared at motion to dismiss hearing and at trial; trial counsel failed to object to many due process violations, including thirteen year [sic] pre-indictment delay, hearsay, confrontation, prosecutorial misconduct that materially influenced trial; trial counsel failed to investigate case, including not motioning for discovery, or *Brady* exculpatory evidence; trial counsel failed to object to trial court's plain errors, including unconstitutional sidebars and violations of Ohio statutes; trial court failed to issue and trial counsel failed to request necessary case specific jury instructions; appellate counsel also failed to use 11-R evidence trial court specifically reserved for appeal; trial and appellate counsel refused to provide defendant-petitioner with all judgment entries and transcripts of proceedings.

(Petition, ECF No. 3, PageID 39-52.)

# Analysis

Although Hawkins pleads eight numbered grounds for relief, many of his grounds contain

sub-claims which are logically and legally related to different constitutional rights than the right

claimed in the ground itself. The Magistrate Judge believes it will be useful to eliminate from

further consideration those claims and sub-claims which have not been preserved for decision on the merits.

**Cognizability**

Federal habeas corpus is available only to correct federal constitutional violations. 28 U.S.C. § 2254(a); *Wilson v. Corcoran,* 562 U.S. 1, 6 (2010); *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *Barclay v. Florida,* 463 U.S. 939 (1983); *Smith v. Phillips*, 455 U.S. 209, 221 (1982). "[I]t is not the province of a federal habeas court to reexamine state court determinations on state law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); see also *Elmendorf v. Taylor*, 23 U.S. (10 Wheat.) 152, 160 (1825)(Marshall C. J.).

Several of the claims made by Hawkins are not for federal constitutional violations and therefore not cognizable in this proceeding. They are as follows:

Ground Two claims that Hawkins' conviction is against the manifest weight of the evidence. A weight of the evidence claim is not a federal constitutional claim. *Johnson v. Havener*, 534 F.2d 1232 (6th Cir. 1986); *Ob'Saint v. Warden, Toledo Correctional Inst.*, 675 F.Supp.2d 827, 832 (S.D. Ohio 2009).

Ground Three makes a claim of cumulative error. As in *Sheppard v. Bagley*, 657 F.3d 338, 348 (6th Cir. 2011), Hawkins "argues that the cumulative effect of these errors rendered his trial fundamentally unfair." *Id.* Post-AEDPA, however, that claim is not cognizable in habeas corpus. *Id.*, *citing Moore v. Parker,* 425 F.3d 250, 256 (6th Cir. 2005). Cumulative error claims are not cognizable because the Supreme Court has not spoken on the issue. *Williams v. Anderson*, 460

F.3d 789, 816 (6th Cir. 2006), citing *Moore*, *supra*.

Grounds Two and Three should therefore be dismissed for failure to state a federal constitutional claim on which relief can be granted in a habeas corpus case.

**Procedural Default**

The procedural default doctrine in habeas corpus is described by the Supreme Court as follows:

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an adequate and independent state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause of the default and actual prejudice as a result of the alleged violation of federal law; or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *see also Simpson v. Jones*, 238 F.3d 399, 406 (6th Cir. 2000). That is, a petitioner may not raise on federal habeas a federal constitutional rights claim he could not raise in state court because of procedural default. *Wainwright v. Sykes*, 433 U.S. 72, 86-87 (1977); *Engle v. Isaac*, 456 U.S. 107, 110 (1982). "Absent cause and prejudice, 'a federal habeas petitioner who fails to comply with a State's rules of procedure waives his right to federal habeas corpus review.'" *Boyle v. Million*, 201 F.3d 711, 716 (6th Cir. 2000), quoting *Gravley v. Mills*, 87 F.3d 779, 784-85 (6th Cir. 1996); *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *Engle*, 456 U.S. at 110; *Wainwright*, 433 U.S. at 87.

> [A] federal court may not review federal claims that were procedurally defaulted in state court—that is, claims that the state court denied based on an adequate and independent state procedural rule. E.g., *Beard v. Kindler*, 558 U.S. 53, 55, 130 S.Ct. 612, 175 L.Ed.2d 417 (2009). This is an important "corollary" to the

> exhaustion requirement. *Dretke v. Haley*, 541 U.S. 386, 392, 124
> S.Ct. 1847, 158 L.Ed.2d 659 (2004). "Just as in those cases in which
> a state prisoner fails to exhaust state remedies, a habeas petitioner
> who has failed to meet the State's procedural requirements for
> presenting his federal claims has deprived the state courts of an
> opportunity to address" the merits of "those claims in the first
> instance." *Coleman* [*v. Thompson,*] 501 U.S. [722,] 731-732, 111
> S.Ct. 2546, 115 L.Ed.2d 640[(1991)]. The procedural default
> doctrine thus advances the same comity, finality, and federalism
> interests advanced by the exhaustion doctrine. See *McCleskey v.
> Zant*, 499 U.S. 467, 493, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991).

*Davila v. Davis*, 137 S.Ct. 2058, 2064 (2017).

> "A claim may become procedurally defaulted in two ways."
> *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006). First, a
> claim is procedurally defaulted where state-court remedies have
> been exhausted within the meaning of § 2254, but where the last
> reasoned state-court judgment declines to reach the merits because
> of a petitioner's failure to comply with a state procedural rule. *Id.*
> Second, a claim is procedurally defaulted where the petitioner failed
> to exhaust state court remedies, and the remedies are no longer
> available at the time the federal petition is filed because of a state
> procedural rule. *Id.*

*Lovins v. Parker*, 712 F.3d 283, 295 (6th Cir. 2013).

Under Ohio law, ineffective assistance of trial counsel claims or indeed any constitutional

claims that depend on evidence outside the appellate record must be raised in a petition for post-

conviction relief under Ohio Revised Code § 2953.21 because evidence cannot be added to the

record on direct appeal. *State v. Madrigal*, 87 Ohio St.3d 378, 390-91 (2000); *State v. Hartman*,

93 Ohio St. 3d 274, 299 (2001); *State v. Keith*, 79 Ohio St. 3d 514, 536 (1997), citing *State v. Scott*,

63 Ohio App. 3d 304, 308 (1989). Conversely, constitutional claims including ineffective

assistance of trial counsel claims which are supported by the appellate record must be raised on

direct appeal and will be barred by *res judicata* if attempted to be raised later in post-conviction.

*State v. Reynolds*, 79 Ohio St. 3d 158, 161 (1997); *State v. Steffen*, 70 Ohio St.3d 399, 410 (1994);

*State v. Lentz*, 70 Ohio St. 3d 527 (1994); *In re T.L.*, 2014-Ohio-1840, ¶ 16, 2014 Ohio App.

LEXIS 1804 (8th App. Dist. 2014).

In response to Ground Five, ineffective assistance of trial counsel, the Warden notes that Hawkins preserved for review five alleged instances, but notes that he also asserts that his trial attorney "failed to object to court's violations of state statutes and rules of evidence" and "failed to object to many instances of prosecutorial misconduct." (Return, ECF No. 11, PageID 2267). These claims are unspecific as to particular occasions of alleged trial counsel omissions. More importantly, the Warden notes that all of these omissions would have been apparent in the direct appeal record, but were not raised in that proceeding. Under those circumstances, the claims are barred by Ohio's criminal *res judicata* doctrine.

In his Eighth Ground for Relief, Hawkins claims he received ineffective assistance of appellate counsel when his direct appeal attorney failed to raise a number of meritorious assignments of error on direct appeal. The Warden asserts these claims are barred by Hawkins' procedural default in failing to raise them in the correct manner under Ohio law, that is, by including them in a properly filed application to reopen the direct appeal under Ohio R. App. P. 26(B).

The Warden asserts that Hawkins' failures, which the First District Court of Appeals held against him, were in filing in an untimely manner, exceeding the ten-page limit established in the Rule, and failing to attach relevant portions of the record (Return, ECF No. 11, PageID 2282-83). Furthermore, after that adverse decision, Hawkins failed to timely appeal to the Supreme Court of Ohio. *Id.* at PageID 2284.

As excusing cause, Hawkins claims the Clerk of Courts "filed with a false cover page on top of Petitioner's actual cover page." (Reply, ECF No. 18, PageID 2322, asking the Court to compare ECF No. 10, PageID 493 with PageID 532.) "Additionally, the Clerk jumbled the pages

of Petitioner's Application.  (Doc. 10, PageID here listed in the order originally intended to have appeared:  532-44, 498-500, 497, 494-96, 502-15, 549, 551-74, 545-48, 516-20, 524, 521-22, 527-29, 501, 531." *Id.*

On August 15, 2018, the Second District Court of Appeals had before it Hawkins' delayed application for reopening which he had filed on July 11, 2018.  *State v. Hawkins*, Appellate Case No. 27019 (State Court Record, ECF No. 10-1, PageID 634 *et seq*.).  In it the court noted that its decision on direct appeal affirming the conviction had been entered March 9, 2018.  *Id.* at ECF No. 637.  The court found Hawkins had filed a document labeled "Reply" in Appellate Case No. 26962 on June 11, 2018, and noted that that appellate case had been dismissed for lack of jurisdiction.  *Id.*

The referenced document appears in the State Court Record at Ex. 46, PageID 493-97 and bears Appellate Case No. CA 026962 in what appears to be Hawkins' handwriting.  It appears that the pages were misordered in filing (assuming they appear in the State Court Record as they appear in the files of the Montgomery County Clerk of Courts) because PageID 532, which appears to be a title page for Hawkins' Application for Reopening, bears no date stamp from the Clerk. Ordinarily a Clerk's date stamp would be on the first page.  Here the Court of Appeals Clerk's date stamp appears on PageID 493, a page Hawkins labeled "Reply."

However that misordering came about, it does not provide excusing cause.  The Second District denied the Application not because it was not in order, but because it was not timely. Hawkins told the court of appeals he was late because of lack of funds, but the court rejected that excuse, considering "the many documents he has had the ability, and has chosen, to file." (Opinion, State Court Record, ECF No. 10-1, PageID 639).  It also held against him the fact that he had filed in excess of ten pages and had failed to attach the required portions of the record.  As noted by

Respondent, Ohio has a legitimate interest independent of federal law in having claims of ineffective assistance of appellate counsel presented in an orderly fashion that permits appropriate consideration. Aside from the prolixity of the filing, failure to timely file a 26(B) application has been held by the Sixth Circuit to be an adequate and independent ground of state decision. *Hoffner v. Bradshaw*, 622 F.3d 487, 504-505 (6th Cir. 2010).

Separate and apart from the deficiencies in filing the 26(B) application, Hawkins also defaulted his ineffective assistance of appellate counsel claims by never appealing to the Supreme Court of Ohio from the Second District's denial. Here again Hawkins blames that failure on the clerk's misordering (Reply, ECF No. 18, PageID 2323). He attaches a document labeled "Notice of Delayed Appeal of Appellant Brian Hawkins" which shows it was received by the Clerk of the Supreme Court of Ohio on October 16, 2018. (State Court Record, ECF No. 18, PageID 2326.) He also attached a document labeled "Notice of Appeal" which bears "received" stamps of September 27, 2018, and October 16, 2018. *Id*. at PageID 2327. He attaches no correspondence from the Supreme Court Clerk explaining why neither of these documents was filed, but states in his Reply that it is because the Clerk of the Supreme Court "is required to refuse to file an [sic] delayed appeal of an [sic] 26(B) Application for reopening . . . which is what the Clerk did." (Reply, ECF No. 18, PageID 2323.) Failure to file an appeal to the Supreme Court of Ohio from an adverse ruling of a court of appeals within forty-five days is an adequate and independent state ground of decision. *Bonilla v. Hurley,* 370 F.3d 494, 497 (6th Cir. 2004).

Therefore, the unspecific claims of ineffective assistance of trial counsel in Ground Five and all of the claims of ineffective assistance of appellate counsel in Ground Eight are procedurally defaulted and should be dismissed on that basis.

**Ground One:  Pre-Indictment Delay**


The offense in suit happened in July 2002 and Hawkins was not indicted until May 2015.

Claiming that this delay deprived him of his rights under the Due Process Clause of the Fourteenth

Amendment, Hawkins filed a pre-trial motion to dismiss on that basis.  Having been unsuccessful

in the state courts, he reiterates that claim in his First Ground for Relief.  The Warden concedes

the claim is preserved for merits review here and contends the Second District's decision is entitled

to deference under the Antiterrorism and Effective Death Penalty Act of 1996 (Pub. L. No 104-

132, 110 Stat. 1214)(the "AEDPA").

When a state court decides on the merits a federal constitutional claim later presented to a

federal habeas court, the federal court must defer to the state court decision unless that decision is

contrary to or an objectively unreasonable application of clearly established precedent of the

United States Supreme Court.  28 U.S.C. § 2254(d)(1); *Harrington v. Richter*, 562 U.S. 86, 100

(2011); *Brown v. Payton,* 544 U.S. 133, 140 (2005); *Bell v. Cone*, 535 U.S. 685, 693-94 (2002);

*Williams (Terry) v. Taylor,* 529 U.S. 362, 379 (2000).  Deference is also due under 28 U.S.C. §

2254(d)(2) unless the state court decision was based on an unreasonable determination of the facts

in light of the evidence presented in the state court proceedings.  In habeas it is the last reasoned

state court judgment which must be reviewed.  Y*lst v. Nunnemaker*, 501 U.S. 797, 803 (1991).

Hawkins raised the pre-indictment delay as his first assignment of error on appeal and the

Second District decided it as follows:

> **[\*P7]** Hawkins' First Assignment of Error states that:
>
> > The Trial Court Erred in Overruling Mr. Hawkins' Motion
> > to Dismiss, as the Thirteen Year Pre-Indictment Delay
> > Caused Actual Prejudice to His Right to a Fair Trial, Thus
> > Violating His Due Process Rights.

**[\*P8]** Under this assignment of error, Hawkins contends that he suffered actual prejudice due to a delay of nearly 13 years between the alleged crime and the filing of the indictment. Hawkins' claim of prejudice is based on the fact that the only two persons who could potentially corroborate what happened on the night in question are now deceased.

**[\*P9]** "An unjustifiable delay between the commission of an offense and a defendant's indictment therefor, which results in actual prejudice to the defendant, is a violation of the right to due process of law under Section 16, Article I of the Ohio Constitution and the Fifth and Fourteenth Amendments to the United States Constitution." *State v. Luck*, 15 Ohio St. 3d 150, 15 Ohio B. 296, 472 N.E.2d 1097 (1984), paragraph two of the syllabus. "Once a defendant presents evidence of actual prejudice, the burden shifts to the state to produce evidence of a justifiable reason for the delay." (Citations omitted.) *State v. Jones*, 148 Ohio St. 3d 167, 2016-Ohio-5105, 69 N.E.3d 688, ¶ 13.

**[\*P10]** Decisions on "actual prejudice" involve "'a delicate judgment based on the circumstances of each case.'" *State v. Walls*, 96 Ohio St. 3d 437, 2002-Ohio-5059, 775 N.E.2d 829, ¶ 52, quoting *United States v. Marion*, 404 U.S. 307, 325, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971). To make this assessment, "courts are to consider the evidence as it exists when the indictment is filed and the prejudice the defendant will suffer at trial due to the delay." *Walls* at ¶ 52, citing *Luck* at 154. (Other citation omitted.) However, "speculative prejudice does not satisfy the defendant's burden." *Jones* at ¶ 20, citing *Luck* at ¶ 56. (Other citation omitted.)

**[\*P11]** In the case before us, the trial court heard from the following witnesses at the evidentiary hearings in connection with Hawkins' motion to dismiss: Brian Hawkins; Wayne Miller, Hawkins' private investigator; Carol Ewing, a retired detective with the Dayton Police Department ("DPD"); Lindsey Dulaney, a current detective with the DPD Special Victims' Unit ("SVU"); Gary Ware, an investigator with the Montgomery County Prosecutor's Office; and Justin Hayes, a training detective for the DPD SVU. The testimony of these individuals revealed the following factual background.

**[\*P12]** In July 2002, Ewing was a detective assigned to the DPD sexual assault child endangerment unit. Ewing was assigned a case involving A.J., who had allegedly been raped in the early morning hours of July 30, 2002, while she was a runaway from a foster home. The rape occurred outdoors behind the Wesley Center, which was

located on Delphos Avenue, in Dayton, Ohio. At the time, A.J. was fifteen years old.

[*P13] After the alleged rape, A.J. ran to a nearby Burger King, which was located a few blocks from the Wesley Center, and pounded on the restaurant's door. A security guard answered and called the police, who transported A.J. to Dayton Children's Hospital, where a rape kit was done. The rape kit was then sent to the Miami Valley Regional Crime Lab ("MVRCL") for processing.

[*P14] Originally, based on information as to the assailant's alleged nickname of "Twin," Ewing put together two photospreads, but A.J. did not pick out either of the suspected individuals. On August 6, 2002, A.J. provided Ewing with Brian Hawkins' name, which A.J. had obtained from friends. Ewing compiled another photospread, and on August 14, 2002, A.J. identified Hawkins as the person who had committed the rape.

[*P15] Ewing interviewed Hawkins in his home on October 29, 2002, because he had been recently shot and could not walk. The interview was not recorded. Ewing would have noted in her report if Hawkins were heavily sedated or under the influence during the interview. She did not make such a notation.

[*P16] Ewing told Hawkins the date of the alleged offense, and he said he thought he might have been in the hospital at the time. Ewing later followed up and learned that Hawkins had been in the hospital on August 11, 2002, which was about a week and a half after the alleged rape.

[*P17] Ewing asked Hawkins if he knew someone with A.J.'s name, and he said he did not. He stated that he did not know A.J., that he would not have sex with a minor, and that he would not have sex outside. Hawkins did not provide Ewing with the names of any witnesses or an alibi. If Hawkins had given Ewing the names of witnesses, she would have followed up.

[*P18] Hawkins recalled talking to a detective in October 2002. He stated that he had just gotten shot and was sedated. Although he could not recall what the detective said, he also testified that she talked about a knife, which "threw" him off. He said he thought they had the wrong person because he had never pulled a knife on anyone. The police did not show him any pictures of the victim. He also denied that he had said he would not have sex outside, as he had done that plenty of times. He claimed Ewing had lied in her report.

**[\*P19]** In November 2002, Ewing was injured and her last day of work was February 2, 2004. During the interim, she had two surgeries and at some point was on restricted duty until she retired. She could not recall specific dates, other than that she had her first surgery in July 2003. In February or March 2003, Ewing received results back from MVRCL, indicating the presence of sperm in the rape kit. Ewing then obtained a court order in October 2003 for a buccal swab from Hawkins. At that point, Ewing was on restricted duty, and another detective obtained the sample from Hawkins.

**[\*P20]** DPD did not receive the results from the DNA test until March 2004, which was after Ewing retired. Hawkins' DNA was a match, and there would have been sufficient cause at that time for the police to present the case to the prosecutor's office.

**[\*P21]** Ewing's notes on the case, including the photo spread, were kept in a packet, which was the official police file. There would have been a notation on the front concerning whether the case was closed or open. Ewing also kept her pending cases in a certain file cabinet. She did not know what happened to the case files after she left the DPD, and she did not recall if she specifically told someone that there were pending cases in the file cabinet.

**[\*P22]** Hawkins continued to reside in the Dayton area and did not move out of state between 2002 and 2015. Nothing more was done on the case until January 2015, when Detective Dulaney received a phone call from the Miami County Prosecutor's Office, indicating that the office had received a CODIS hit or DNA match on a case that was an investigation in the city of Dayton. The prosecutor sent Dulaney a copy of the 2004 lab report. Dulaney pulled the police report and saw that A.J.'s case had never been presented to the Montgomery County Prosecutor's Office. After the case was assigned to her, Dulaney located A.J., and spoke with her. Dulaney also attempted to find Hawkins to obtain his side of the story, but could not locate him at the time.

**[\*P23]** Dulaney was never able to locate Ewing's packet, which contained the photo spread and Ewing's notes. However, any notes that Ewing took and anything she did during her investigation would have been put into a police report. Dulaney was able to obtain a copy of the police report, because that was stored electronically. The police were also able to locate the following evidence: the 2002 rape kit, which was stored at the old Montgomery County Jail; Hawkins' buccal swab, which was still at MVRCL; and A.J.'s clothing, which was still intact. In addition, DPD was able to locate the following witnesses: the MVRCL employee who had processed the rape kit;

the doctor and nurse who had collected the rape kit and who were still working at Dayton Children's Hospital; the Burger King security guard, who recalled speaking to A.J.; and the DPD officer who had responded to the call from the Burger King. This officer had retired from the DPD, but recalled the incident.

[*P24] After being unable to find Hawkins, Detective Dulaney entered a suspect locator into the police system, which meant that if police came into contact with Hawkins, he would be told that Dulaney wished to speak with him. After the locator was in the system for a time with no success, the prosecutor went to a grand jury and obtained a warrant for Hawkins' arrest.

[*P25] In May 2015, Dulaney was able to interview Hawkins. At the time, he was in jail and was transported to the Safety Building for an interview. Hawkins was told that he was there for an interview in connection with a rape investigation, and after being informed of his Miranda rights, agreed to speak with the police.

[*P26] Dulaney told Hawkins about the allegations, and Hawkins said it never happened and that he did not know A.J. Although Dulaney showed him photos of A.J. — one photo was older, and the other was recent — Hawkins still did not recall knowing A.J. During the interview, Hawkins did not give Dulaney the names or addresses of any witnesses. If he had given her names, she would have tried to locate the witnesses.

[*P27] At the pre-indictment hearing, Hawkins testified that he had reviewed the police report as part of discovery and did not deny having sex with A.J. He maintained that they agreed to have sexual relations and the activity was not due to force.

[*P28] According to Hawkins, he met A.J. around 3:00 a.m. on July 30, 2002, when he was leaving a "bootleg joint" on Shoop Avenue in Dayton, Ohio. The bootleg joint was an after-hours place where people came to gamble, drink, and meet women. Hawkins stated that the bootleg joint had two security guards who checked identification and patted people down. They also had a metal detector, and would not let people in who had weapons like knives. In addition, no one under 18 years of age was allowed inside. Hawkins identified three people as potential witnesses: Bobby Cartwright, who worked as a security guard, Kevin Cartwright, who used to come to the bootleg joint, and Jermaine Hunter, who was present in the yard of the bootleg joint that night.

[*P29] The Cartwrights were Hawkins' cousins, and could discuss security, as well as the fact that underage persons were not allowed, meaning that A.J. had lied about her age. Bobby was working that night, but would not have seen Hawkins and A.J., because he was inside. Jermaine Hunter was outside talking to A.J. when Hawkins left the bootleg joint, and was close enough to hear conversation between Hawkins and A.J. when she initially followed Hawkins away from the bootleg joint. Hunter could also testify that A.J. initiated contact with Hawkins. According to Hawkins, he had lost contact with these individuals and had not seen them for a number of years. He thought Hunter was in prison and had mental problems.

[*P30] Hawkins testified that when he left the bootleg joint, A.J. followed him. He stated that at the time, he stayed at different people's houses. Consequently, he and A.J. went to different people's houses but no one was there. Hawkins described walking to a house on Delphos Avenue, then to a house on Bedford Street, back to the house on Delphos, and next to another house located at Oakridge Drive and Tyson Avenue. On the way back from the last location, A.J. propositioned Hawkins for sex the whole time.

[*P31] According to Hawkins, he and A.J. then had a sexual encounter behind the Wesley Center. Afterward, they went to a house on Upland Avenue, where Hawkins' friend, "Moochie," lived. Hawkins did not know Moochie's real name; everyone just called him Moochie. When Hawkins and A.J. arrived at Moochie's house, Hawkins told A.J. to stay outside, but she insisted on coming inside.

[*P32] Several people were at the house, including a woman named Tony Ousley, who was the mother of Hawkins' friend, "Squiggy." Hawkins and Squiggy had both grown up in the same neighborhood. According to Hawkins, he told Ousley that he and A.J. had sex and that A.J. was 18 years old. While they were there, Ousley spoke to A.J., who verified that she and Hawkins had sex. When Hawkins and A.J. left, Ousley pulled him to the side and said he needed to get away from A.J. or he was going to get in trouble. Ousley specifically stated that A.J. was lying about her age. When Hawkins found out from Ousley that A.J. was too young, he walked with A.J. for a few blocks and then handed her a couple of dollars. At that point, A.J. became angry. Hawkins believed she was mad because she thought she was going to stay with him the rest of the night.

[*P33] By the time of the pre-indictment hearing, Moochie's house and the house where the bootleg joint was had been torn down. Hawkins' investigator, Wayne Miller, found the last known address of the Cartwrights, but was not able to actually locate them. He

visited their last known address, but it looked vacant and vines were growing from beside the house onto the front door. Miller did locate Hunter, who was in a prison mental ward, and interviewed him. When shown a picture of A.J., Hunter said he had never seen her; he also said he could not recall ever visiting the bootleg joint on Shoop Avenue.

**[*P34]** Miller additionally discovered that Squiggy had been murdered in 2008 and that Tony Ousley passed away in 2011. At the hearing, Hawkins testified that Moochie was also dead and that he was not previously aware that Ousley had died. Hawkins said he could, however, have located both Moochie and Ousley in the past.

**[*P35]** As was noted, after the court heard the evidence, it concluded that Hawkins failed to prove actual, substantial prejudice. In particular, the court noted that its evaluation hinged on Hawkins' credibility, and that Hawkins was not credible.

**[*P36]** In contending that the trial court erred, Hawkins argues that Ohio courts have not employed a credibility analysis in pre-indictment delay cases. Hawkins further contends that the facts of this case directly compare to those in [*State v. Luck*], 15 Ohio St. 3d 150, 15 Ohio B. 296, 472 N.E.2d 1097 [(1984)], where the Supreme Court of Ohio held that pre-indictment delay had prejudiced the defendant. We disagree with both assertions.

**[*P37]** As a preliminary matter, Ohio appellate courts have held that decisions on motions to dismiss for pre-indictment delay should be reviewed on the following basis: legal issues are reviewed de novo, but "the court's findings of fact are afforded great deference." (Citations omitted.) *State v. Powell*, 2016-Ohio-1220, 61 N.E.3d 789, ¶ 11 (8th Dist.). *See also State v. Zimbeck*, 195 Ohio App. 3d 729, 2011-Ohio-2171, 961 N.E.2d 1141, ¶ 20 (6th Dist.); *State v. Winkle*, 7th Dist. Mahoning No. 12 MA 162, 2014-Ohio-895, ¶ 23; *State v. Cochenour*, 4th Dist. Ross No. 98CA2440, 1999 Ohio App. LEXIS 1054, 1999 WL 152127, *1 (Mar. 8, 1999).

**[*P38]** We agree with these standards, which are consistent with standards of review for other pretrial matters like suppression motions. In suppression situations, trial courts hear evidence on factual points and must necessarily make decisions on witness credibility. *See, e.g., State v. Burnside*, 100 Ohio St. 3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8; *State v. Brown*, 2016-Ohio-4973, 67 N.E.3d 1278, ¶ 7 (2d Dist.). As these decisions note, trial courts "are in the best position to resolve factual questions and evaluate the

credibility of witnesses." *Burnside* at ¶ 8, citing *State v. Mills*, 62 Ohio St.3d 357, 366, 582 N.E.2d 972 (1992).

**[*P39]** In *Luck*, the Supreme Court of Ohio considered whether the defendant was prejudiced by a fifteen-year delay between the time of a murder and her indictment for the murder. *Luck*, 15 Ohio St.3d at 152, 472 N.E.2d 1097. The defendant, Katherine Luck, was one of the suspects originally interviewed around the time of the crime. However, after an initial investigation, the police could not gather any new evidence and took no official action for about fifteen years. *Id.* at 151. At that point, for reasons that were not clear in the record, an indictment was obtained against Luck, and she was arrested. *Id.*

**[*P40]** While under arrest, Luck made a confession at the police station, indicating that she had been physically attacked by the decedent, who was then killed in the fight that ensued. *Id.* at 157. According to Luck's confession, another individual, who was her acquaintance (and who had also been an original suspect) was present at the time of the alleged murder. *Id.* She told the police that this person, who was the only one who could help her, was dead. *Id.*

**[*P41]** After concluding that the confession had been illegally obtained, the court found that defendant was "obviously prejudiced by not being able to seek verification of her story from [the deceased witness] and thereby establish mitigating factors or a defense to the charge against her." *Id.* at 158. Finding both actual prejudice and an unjustifiable delay by the State, the court affirmed the dismissal of the murder charge. *Id.* at 159.

**[*P42]** Unlike the defendant in *Luck*, Hawkins never asserted, either when he was originally interviewed in 2002, or when he was interviewed in 2015, that he had consensual sex with A.J. and that witnesses existed who could verify his story. Instead, he denied that he had been involved in any such incident. Consequently, *Luck* is not directly comparable to the case before us.

**[*P43]** In *State v. Dixon*, 2015-Ohio-3144, 40 N.E.3d 601 (8th Dist.), the State waited almost 20 years to indict a defendant for rape. *Id.* at ¶ 2. After the trial court dismissed the charge due to pre-indictment delay, the Eighth District Court of Appeals affirmed. Notably, in that case, two parole revocation hearings were held in 1993, shortly after the victim told the police that the defendant had raped her. At the parole revocation hearings, the defendant admitted having sexual intercourse with the complainant, but claimed it was consensual. *Id.* at ¶ 6. The defendant was sent back to prison for the parole violation, but the State did not initiate any prosecution on the

rape charge for almost 20 years, after the police "received a CODIS [Combined DNA Index System] hit confirmation from the Federal Bureau of Criminal Investigation that they had made a preliminary association between a submitted rape kit and the Defendant." *Id.*

**[\*P44]** Two witnesses who had testified at the parole revocation hearings were unavailable, including the defendant's former employer, who was deceased. *Id.* at ¶ 9. This witness, Norman Diamond, had testified at the revocation hearings that "he spoke with the alleged victim after the incident and the victim told Diamond that 'she had feelings for [Dixon]' and 'if she could not have [Dixon], no one would.' Diamond further testified that the alleged victim told him that the sexual encounter was 'mutual with no force.'" *Id.*

**[\*P45]** In concluding that the defendant had established actual prejudice, the court commented that the case against the defendant hinged on the victim's credibility. *Id.* at ¶ 30. The court further observed that the testimony of the deceased witness directly supported the defendant's assertion that the sex was consensual, and also undermined the victim's testimony. *Id.*

**[\*P46]** Again, these facts are far different than those involved in the case before us. Hawkins never asserted that the sex was consensual or that witnesses existed.

**[\*P47]** Hawkins also relies on *State v. Jones*, 148 Ohio St. 3d 167, 2016-Ohio-5105, 69 N.E.3d 688, in which the court stated that a defendant's "inability to articulate specifically what [a witness's] testimony would have been does not render his claim of prejudice fatally speculative," as the court has "held that a defendant may establish actual prejudice where he or she is unable to seek verification of his or her story from a deceased witness." *Id.* at ¶ 28, citing *Luck*, 15 Ohio St.3d at 157, 472 N.E.2d 1097. However, by making these comments, the court was not advancing a novel proposition of law; it was discussing its prior decision in *Luck*. Moreover, the issue in the case before us is not Hawkins' inability to articulate the content of a deceased witness's testimony; the relevant matter is that the trial court did not find Hawkins credible. As was noted, the trial court was in the best position to assess credibility, and we defer to the court's factual findings.

**[\*P48]** As a final matter, Hawkins contends that the State's pre-indictment delay was not justifiable, as the police simply allowed the case to "slip through the cracks." Because Hawkins failed to meet his initial burden of proving actual prejudice, we need not

consider this issue. *See, e.g., Jones* at ¶ 13, citing *State v. Whiting*, 84 Ohio St. 3d 215, 217, 1998-Ohio-575, 702 N.E.2d 1199 (1998), and *State v. Adams*, 144 Ohio St. 3d 429, 2015-Ohio-3954, 45 N.E.3d 127, ¶ 99.

[*P49] Accordingly, the trial court did not err when it concluded that Hawkins failed to establish actual prejudice. The First Assignment of Error, therefore, is overruled.

*State v. Hawkins*, 2018-Ohio-867.

In his Reply, Hawkins raises a new argument about pre-indictment delay, to wit, that prosecution was barred by the statute of limitations. He asserts that the rape statute was amended effective July 16, 2015, to allow prosecution within twenty-five years after the offense or five years after a DNA match is made (ECF No. 18, PageID 2309, citing Ohio Revised Code § 2901.13(D)(1) and (2). He claims that both his May 11, 2015, and July 22, 2015, indictments are untimely under Ohio Revised Code § 2901.13(D)(2) because they came more than five years after the DNA match in March 2004. This argument misreads Ohio Revised Code § 2903.13(D)(2) which, in a case in which the DNA match is made within twenty-five years of the offense, prosecution "may be commenced within the longer of twenty-five years after the offense is committed or five years after the determination is complete." The offense here was committed in July 2002 and twenty-five years from that date will not occur until July 2027. In any event this statute of limitations claim is procedurally defaulted because it was not presented to the state courts.

Other than his statute of limitations claim, Hawkins offers no criticism of the Second District's decision on his pre-indictment delay claim. Because the court of appeals recognized the controlling Supreme Court precedent and reasonably applied it to the facts at hand its decision is entitled to deference under 28 U.S.C. § 2254(d)(1). It was correct in rejecting Hawkins' claim that credibility of witnesses is not part of the appropriate standard for review. Anytime a trial court

must decide a factual question on the basis of oral testimony, the credibility of the witnesses who testify is necessarily a component part of the decision and is entitled to deference by reviewing state appellate courts and federal habeas courts.

Hawkins First Ground for Relief should be dismissed on the merits.


**Ground Four:  Conviction Based On Insufficient Evidence**


In his Fourth Ground for Relief, Hawkins claims his conviction is based on insufficient evidence.

An allegation that a verdict was entered upon insufficient evidence states a claim under the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Jackson v. Virginia,* 443 U.S. 307 (1979); *In re Winship*, 397 U.S. 358 (1970); *Johnson v. Coyle*, 200 F.3d 987, 991 (6th Cir. 2000); *Bagby v. Sowders*, 894 F.2d 792, 794 (6th Cir. 1990)(*en banc*).  In order for a conviction to be constitutionally sound, every element of the crime must be proved beyond a reasonable doubt.  *In re Winship*, 397 U.S. at 364.

> [T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt . . . .  This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence and to draw reasonable inferences from basic facts to ultimate facts.

*Jackson*, 443 U.S. at 319; *United States v. Paige,* 470 F.3d 603, 608 (6th Cir. 2006); *United States v. Somerset*, 2007 U.S. Dist. LEXIS 76699 (S.D. Ohio 2007).  This rule was recognized in Ohio law at *State v. Jenks*, 61 Ohio St. 3d 259 (1991)(paragraph two of the syllabus), superseded on other grounds by state constitutional amendment as stated in *State v. Smith*, 80 Ohio St.3d 89, 102

n.4 (1997). Of course, it is state law which determines the elements of offenses; but once the state has adopted the elements, it must then prove each of them beyond a reasonable doubt. *In re Winship, supra.*

In cases such as Petitioner's challenging the sufficiency of the evidence and filed after enactment of the AEDPA, two levels of deference to state decisions are required:

> In an appeal from a denial of habeas relief, in which a petitioner challenges the constitutional sufficiency of the evidence used to convict him, we are thus bound by two layers of deference to groups who might view facts differently than we would. First, as in all sufficiency-of-the-evidence challenges, we must determine whether, viewing the trial testimony and exhibits in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In doing so, we do not reweigh the evidence, re-evaluate the credibility of witnesses, or substitute our judgment for that of the jury. See *United States v. Hilliard*, 11 F.3d 618, 620 (6th Cir. 1993). Thus, even though we might have not voted to convict a defendant had we participated in jury deliberations, we must uphold the jury verdict if any rational trier of fact could have found the defendant guilty after resolving all disputes in favor of the prosecution. Second, even were we to conclude that a rational trier of fact could not have found a petitioner guilty beyond a reasonable doubt, on habeas review, we must still defer to the state appellate court's sufficiency determination as long as it is not unreasonable. See 28 U.S.C. § 2254(d)(2).

*Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009). In a sufficiency of the evidence habeas corpus case, deference should be given to the trier-of-fact's verdict under *Jackson* and then to the appellate court's consideration of that verdict, as commanded by AEDPA. *Tucker v. Palmer*, 541 F.3d 652 (6th Cir. 2008); *accord Davis v. Lafler,* 658 F.3d 525, 531 (6th Cir. 2011)(*en banc*); *Parker v. Matthews*, 567 U.S. 37, 43 (2012). Notably, "a court may sustain a conviction based upon nothing more than circumstantial evidence." *Stewart v. Wolfenbarger,* 595 F.3d 647, 656 (6th Cir. 2010).

> We have made clear that *Jackson* claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial

deference. First, on direct appeal, "it is the responsibility of the jury -- not the court -- to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." *Cavazos v. Smith*, 565 U. S. 1, [2] (2011) (per curiam). And second, on habeas review, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" *Ibid.* (quoting *Renico v. Lett*, 559 U. S. [766, 773,] (2010)).

*Coleman v. Johnson*, 566 U.S. 650, 651, (2012)(*per curiam*)(parallel citations omitted); *Parker v. Matthews*, 567 U.S. 37, 43 (2012) (*per curiam*). The federal courts do not make credibility determinations in reviewing sufficiency of the evidence claims. *Brooks v. Tennessee,* 626 F.3d 878, 887 (6th Cir. 2010).

The Warden defends this Ground on the merits, asserting that the Second District's decision is not an objectively unreasonable application of *Jackson* (Return, ECF No. 11, PageID 2259-66).

The Second District discussed Hawkins' manifest weight and sufficiency of the evidence claims together, writing:

### III. Manifest Weight and Sufficiency of the Evidence

[**\*P50**] Hawkins has raised issues pertaining to manifest weight and sufficiency of the evidence. Because these issues are related, we will consider them together. Hawkins' Second Assignment of Error states that:

> The Jury Erred in Finding Mr. Hawkins Guilty of Rape and Kidnap as the Convictions Are Against the Manifest Weight of the Evidence.

[**\*P51**] Hawkins' Fourth (and First Supplemental) Assignment of Error states as follows:

> Hawkins' Convictions Were Based on Insufficient Evidence.

23

**[*P52]** Under the manifest weight assignment of error, Hawkins argues that the physical evidence supports his version of events, and that A.J. made multiple inconsistent statements. Concerning sufficiency, Hawkins contends that the only evidence of a forcible encounter came from A.J., who had a revenge motive to lie, as she was bitter because she did not succeed in her efforts to find a place to stay and to obtain money.

**[*P53]** "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." (Citation omitted.) *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10. In such situations, we apply the test from *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), which states that

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

(Citation omitted). *Id.* at paragraph two of the syllabus.

**[*P54]** In contrast,"[a] weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." (Citation omitted.) *Wilson* at ¶ 12. In this situation, a court reviews "'the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 20 Ohio B. 215, 485 N.E.2d 717 (1st Dist.1983). "The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the

evidence." *State v. Adams*, 2d Dist. Greene Nos. 2013-CA-61, 2013-CA-62, 2014-Ohio-3432, ¶ 24, citing *Wilson* at ¶ 14.

**[*P55]** "Although sufficiency and manifest weight are different legal concepts, manifest weight may subsume sufficiency in conducting the analysis; that is, a finding that a conviction is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency." (Citations omitted.) *State v. McCrary*, 10th Dist. Franklin No. 10AP-881, 2011-Ohio-3161, ¶ 11. *Accord State v. Winbush*, 2017-Ohio-696, 85 N.E.3d 501, ¶ 58 (2d Dist.) As a result, "a determination that a conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency." (Citations omitted.) *State v. Braxton*, 10th Dist. Franklin No. 04AP-725, 2005-Ohio-2198, ¶ 15.

**[*P56]** Furthermore, since a factfinder "has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness." *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 Ohio App. LEXIS 3709, 1997 WL 476684, *4 (Aug. 22, 1997).

**[*P57]** In contrast, "the decision as to which of several competing inferences, suggested by the evidence in the record, should be preferred, is a matter in which an appellate judge is at least equally qualified, by reason and experience, to venture an opinion." *Id.* "Consequently, we defer more to decisions on what testimony should be credited, than we do to decisions on the logical force to be assigned to inferences suggested by evidence, no matter how persuasive the evidence may be." *State v. Brooks*, 2d Dist. Montgomery No. 21531, 2007-Ohio-1029, ¶ 28, citing *Lawson*, 1997 Ohio App. LEXIS 3709, [WL] at *4.

**[*P58]** After reviewing the record, we conclude that the judgment of the trial court is not against the manifest weight of the evidence, and, therefore, is also supported by sufficient evidence.

**[*P59]** Hawkins was indicted on one count of rape in violation of R.C. 2907.02(A)(2). This statute provides, in pertinent part, that "[n]o person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or

threat of force." "Sexual conduct" includes, among other things, "vaginal intercourse between a male and female." R.C. 2907.01(A).

[*P60] Hawkins was also charged with kidnapping in violation of R.C. 2905.01(A)(4). This statute provides, in pertinent part, that:

No person, by force, threat, or deception, or, in the case of a victim under the age of thirteen or mentally incompetent, by any means, shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:
* * *
(4) To engage in sexual activity, as defined in section 2907.01 of the Revised Code, with the victim against the victim's will * * *.

[*P61] As was noted, the victim, A.J., was 15 years old at the time of the alleged offenses, and the trial did not occur until more than 13 years later. A.J. did not recall every detail, but did specifically recall encountering Hawkins in the early morning hours of July 30, 2002, near Shoop Avenue, and walking with him for a period of time, during which he told her that he had a place for her to stay and that he wanted to feed her and treat her like his daughter. However, when they were on a sidewalk that ran behind the Wesley Center, Hawkins became physical, threw A.J. on the ground, and raped her, by inserting his penis into her vagina. He also held a knife to her neck and restrained her.

[*P62] After this occurred, A.J. ran to a nearby Burger King for help. Her testimony in this regard was corroborated by the security guard, who stated that a distraught female came to the restaurant around 4:00 a.m. on July 30, 2002, and asked for help. According to the guard, the woman was crying and asked him to call the police, which he did.

[*P63] The responding officer, Jeffrey Huber, testified that when he arrived at Burger King, A.J. was crying and visibly shaking, and her hair was out of order. She reported that she had come in contact with a man on Shoop Avenue, and had walked with him for a while, during which time he said he would take care of her and get her food. However, the man subsequently grabbed her while they were behind the Wesley Center and told her to pull her pants down. When she resisted, he pulled out a knife and threatened her. He then raped her. Huber took A.J. back to the Wesley Center, and she pointed out the area where the rape had occurred. Huber noticed grass in A.J.'s hair and on her clothing, and he could tell that someone had been on the

ground in the area that she pointed out. He then took A.J. to Dayton Children's Hospital.

[*P64] The nurse who examined A.J. at the hospital testified about a history that A.J. had given her concerning the incident. This history was similar to the facts noted above. The nurse further stated that A.J. reported pain in her pelvic bone. In addition, the doctor who conducted A.J.'s physical examination observed swelling in the vaginal area to the extent that he was unable to insert a small speculum in that area. The doctor testified that he found evidence of sexual activity consistent with penile vaginal rape.

[*P65] Detective Ewing, who first worked on the case, met with A.J. the day after the incident. Ewing also recounted various details of A.J.'s story that were consistent with A.J.'s statements to the other witnesses and with A.J.'s trial testimony. Ewing additionally testified about details of her interview with Hawkins in October 2002. At that time, Hawkins stated that he did not know A.J., would never have sex with a minor, and would not have sex outside. Transcript of Proceedings (Jury Trial), Vol. I, p. 237.

[*P66] In contrast to this evidence, Hawkins testified that as he had during the pre-indictment hearing, which was that he met A.J. outside the bootleg joint and that they walked to various locations in the area. Hawkins described A.J. basically as following him throughout this time, persisting when he walked away from her, and eventually initiating and consenting to have sexual intercourse. His implication was that A.J. did so in order to obtain money and shelter. He also believed that A.J. accused him of rape because she was angry when he left her after they had sex.

[*P67] There were a few inconsistencies in A.J.'s testimony, such as whether Hawkins held the knife to the left or to the right side of her neck, or whether the knife was closed or open. This would not be surprising, given A.J.'s age at the time of the incident, and the lapse of time between the incident and her testimony. However, substantial evidence supported her account.

[*P68] There were inconsistencies in Hawkins' account as well. For example, Hawkins testified at trial that he had introduced himself by name to A.J. outside the bootleg joint, and that she had given him her name as well. He also indicated that he later found out she was underage and that they had consensual sex outside the Wesley Center. This testimony was inconsistent with statements Hawkins made to police in 2002, when he denied knowing A.J., and said he would not have sex either with a minor or outside. It is also

inconsistent with his statement to police in 2015, when he denied ever having seen A.J., despite being shown pictures of her taken in 2004, a few years after the incident.

[*P69] "A defendant is not entitled to a reversal on manifest weight grounds merely because inconsistent evidence was presented at trial. * * * The trier of fact is free to believe or disbelieve all or any of the testimony." (Citations omitted.) *State v. Crosky*, 10th Dist. Franklin No. 06AP-655, 2008-Ohio-145, ¶ 78. The trier of facts was in the best position to evaluate witness credibility and to decide the weight to give the testimony. *Lawson*, 2d Dist. Montgomery No. 16288, 1997 Ohio App. LEXIS 3709, 1997 WL 476684, at *4. Clearly, the jury believed A.J. and the ample evidence that supported her testimony.

[*P70] Because the judgment was not against the manifest weight of the evidence, it was also supported by sufficient evidence. Consequently, the Second and Fourth Assignments of Error are without merit and are overruled.

*State v. Hawkins*, 2018-Ohio-867.

In his Reply, Hawkins has little to say about the Fourth Ground for Relief. Basically he reiterates his points about the inconsistencies in the victim's testimony and her motive to lie because she did not get the place to stay, some money, and something to eat which she had hoped for. The jury heard those claims, but also heard the victim's testimony and found it believable. The testimony of a single victim is sufficient to support a conviction, and here many of the facts the victim testified to were corroborated. Hawkins was unable to deny credibly that he had had sexual intercourse with A.J. and the jury heard testimony of a contemporaneous medical examination which concluded her vaginal condition was consistent with forcible rape. There was, therefore, sufficient evidence to convict and the Fourth Ground for Relief should be dismissed.

**Ground Five:  Ineffective Assistance of Trial Counsel**

In his Fifth Ground for Relief, Hawkins asserts he received ineffective assistance of trial counsel in a number of specific ways.[1]  The Warden concedes that the five specific sub-claims of ineffective assistance of trial counsel raised on direct appeal have been preserved for habeas relief, but argues the Second District's decision is not an unreasonable application of the governing federal standard for ineffective assistance of trial counsel set forth in *Strickland v. Washington,* 466 U.S. 668 (1984).

On Hawkins' five specific claims, the Second District wrote:

> [*P72] Hawkins' Fifth (and Second Supplemental) Assignment of Error states that:

>> Hawkins' Counsel Provided Constitutionally Ineffective Assistance Under the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution and Article I, Sections 10 and 16 of the Ohio Constitution.

> [*P73] Under this assignment of error, Hawkins' first contention is that trial counsel was ineffective because he failed to call A.J. as a witness at the hearing on pre-indictment delay. According to Hawkins, there is a reasonable probability that the court would have granted his motion to dismiss the indictment if A.J. had been called to testify. As support for this assertion, Hawkins recounts A.J.'s trial testimony, in which she detailed walking around with Hawkins, being forcibly thrown to the ground, and being raped at knifepoint. Hawkins does not indicate how this testimony would have assisted his motion for pre-indictment delay, other than observing that A.J. remembered some things that happened to her, but did not remember everything.

> [*P74] "In order to prevail on a claim of ineffective assistance of counsel, the defendant must show both deficient performance and resulting prejudice." *State v. Sosnoskie*, 2d Dist. Montgomery No. 22713, 2009-Ohio-2327, ¶ 16, citing *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "Trial counsel is

---

[1] He also claims unspecific violations of his Sixth Amendment right and they have been recommended for dismissal as procedurally defaulted above in the section of this Report under that title.

entitled to a strong presumption that his conduct falls within the wide range of effective assistance, and to show deficiency the defendant must demonstrate that counsel's representation fell below an objective standard of reasonableness." *Id.*

**[*P75]** Hawkins has failed to articulate how having A.J. testify at the motion hearing would have assisted his claim of actual prejudice in the pre-indictment delay, and we see no potential basis for finding trial counsel deficient in this regard. In fact, to the extent that A.J. failed to recall any events, it would have assisted Hawkins at trial in defending against her claims, i.e., he could have challenged inconsistencies or gaps in her testimony.

**[*P76]** Hawkins' second claim of ineffective assistance is based on the fact that trial counsel requested a jury view. According to Hawkins, many structures were torn down and he was prejudiced. He does not suggest how he was prejudiced, and we see no potential prejudice. Given Hawkins' detailed (and sometimes confusing) description of routes he and A.J. took while they walked around, a view of the area would have been helpful to the jury. Furthermore, the State also requested a jury view, and the trial court would have had discretion to grant a jury view. *See, e.g., State v. Zuern*, 32 Ohio St.3d 56, 58, 512 N.E.2d 585 (1987).

**[*P77]** Hawkins' third contention is that trial counsel was ineffective by failing to argue for admission of a social worker's commentary from the rape kit, which could have been used to impeach A.J.'s testimony. This evidence was contained in State's Ex. 11R, and included "references to sexual activity of A.J. and her promiscuity." Transcript of Proceedings (Jury Trial), Vol. II, p. 332. According to the record, this matter had been discussed prior to the start of trial, and the court had informed defense counsel then that the testimony was inadmissible based on the rape shield law. *Id.* at pp. 331-32. During the discussion of this point, defense counsel stated that he did not pursue the issue based on the court's ruling. *Id.* at 332. Nonetheless, the matter, in fact, was discussed in detail, and the trial court specifically stated that the issue had been preserved for appellate review. *Id.* at 332-33.

**[*P78]** The earlier discussion of this issue occurred in the context of the renewal of Hawkins' motion to dismiss for pre-indictment delay. Transcript of Trial Proceedings (Jury Trial), Vol. I, pp. 9-12. At that point, Hawkins' counsel objected because he had not been able to obtain records from Grandview Hospital concerning an assault, perhaps sexual, of A.J. that had allegedly occurred a few weeks before the July 30, 2002 incident. Grandview Hospital had

destroyed these records after 10 years and they could not be obtained. Defense counsel had learned of these records based on the social worker's note in the rape kit; the form also referred to treatment for sexually-transmitted disease, but the context was not clear. *Id.* at p. 11.

[*P79] The trial court stated that this did not affect its prior ruling on pre-indictment delay for two reasons: (1) the defense had the information in the rape kit, which was the central issue at trial; and (2) the records would not have had any impact because there was no indication that they would have led to any admissible evidence. *Id.* at p. 11-12.

[*P80] R.C. 2907.02(D) provides that:

> Evidence of specific instances of the victim's sexual activity, opinion evidence of the victim's sexual activity, and reputation evidence of the victim's sexual activity shall not be admitted under this section unless it involves evidence of the origin of semen, pregnancy, or disease, or the victim's past sexual activity with the offender, and only to the extent that the court finds that the evidence is material to a fact at issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value.

[*P81] "Generally, the rape shield statute excludes evidence of the victim's prior sexual conduct as a means to attack credibility." *State v. Core*, 2d Dist. Montgomery No. 9976, 1987 Ohio App. LEXIS 7591, 1987 WL 12968, *4 (June 17, 1987), citing *State v. Ferguson*, 5 Ohio St.3d 160, 5 Ohio B. 380, 450 N.E.2d 265 (1983). In order to avoid violation of the Confrontation Clause, the Supreme Court of Ohio has used a balancing test to decide whether the evidence may be admitted in certain limited situations. "The key to assessing the probative value of the excluded evidence is its relevancy to the matters as proof of which it is offered." *State v. Gardner*, 59 Ohio St.2d 14, 18, 391 N.E.2d 337 (1979). In *Gardner*, the court rejected the "assumption that prior unchastity with other individuals indicates a likelihood of consent to the act in question with the defendant." *Id.*

[*P82] "'Cases decided since *Gardner* * * * have established that in order for the contested evidence to be admissible, it must be submitted for a more important purpose than mere impeachment of a witness's credibility.'" *State v. Hicks*, 2d Dist. Montgomery No. 17730, 2000 Ohio App. LEXIS 2131, 2000 WL 646505, *4 (May

19, 2000), quoting *In re Michael*, 119 Ohio App.3d 112, 119, 694 N.E.2d 538 (2d Dist.1997). *Accord State v. Hennis*, 2d Dist. Clark No. 2003-CA-21, 2005-Ohio-51, ¶ 52 ("impeaching a witness's credibility is an insufficient reason for admitting evidence that violates the Rape Shield Law").

**[\*P83]** Hawkins does not assert any specific basis for admitting the evidence in question, and it is apparent that the purpose would have been to challenge A.J.'s credibility, which is forbidden under R.C. 2907.02(D) and cases interpreting the statute. Accordingly, defense counsel did not act ineffectively in allegedly failing to argue for admission of the testimony. Moreover, as the State notes, defense counsel did raise this point with the trial court.

**[\*P84]** The fourth issue that Hawkins raises is defense counsel's alleged ineffectiveness in failing to provide the trial court with evidence during the pre-indictment hearing that would have corroborated phone calls that Tony Ousley made to the Dayton Police Department. Notably, nothing to this effect was raised during the pre-indictment hearing, even though Hawkins testified at length on two different occasions — initially on July 23, 2015, and then on rebuttal on August 19, 2015, when Hawkins indicated that he had "remembered some facts that he did not testify to at the previous hearing." Transcript of Proceedings (Evidentiary Hearing), p. 126.

**[\*P85]** At the subsequent jury trial, Hawkins discussed some events that allegedly occurred after the DNA swab was taken in late December 2003. According to Hawkins, he told his friend, "Moochie," about the fact that he had been swabbed. Moochie then contacted Ousley, who called the Dayton police. Apparently, the purpose of this call was to inform someone at the police department that Hawkins had not raped anyone.

**[\*P86]** At trial, Hawkins did not identify any person who was called, the date the call took place, the number that was called, or Ousley's phone number. Hawkins testified that Ousley talked to detectives for 15-20 minutes. Hawkins then talked to someone and handed the phone back to Ousley. According to Hawkins, when he talked to this detective on the phone, he was told the detective would "take care" of it. As a result, Hawkins thought the issue had been resolved.

**[\*P87]** Hawkins now argues that trial counsel was ineffective because he failed to subpoena telephone call records from the DPD for use at the pre-indictment delay hearing.

**[\*P88]** As the State notes, these assertions are wholly speculative. There is no evidence in the record concerning these alleged facts, other than Hawkins' unsubstantiated and vague statements about a phone call at some unidentified date to unidentified persons. The record does not even contain any indication that the police department recorded calls or numbers for calls, or that telephone records were maintained or preserved. Furthermore, as the State points out, the record lacks any indication that even if such records were maintained, they would indicate who was on a particular telephone call. Accordingly, we cannot conclude under this set of facts that trial counsel was ineffective when he failed to subpoena such records for the pre-indictment delay hearing.

**[\*P89]** Hawkins' final point pertains to trial counsel's failure to provide the State with notes of his investigator's conversation with A.J. According to Hawkins, this failure prevented trial counsel from being able to properly cross-examine and impeach A.J. about comments she made to the investigator. The comment that Hawkins mentioned concerns A.J.'s statement that the knife was "closed" rather than open at the time of the assault.

**[\*P90]** Hawkins' complaint in this context is unclear. At some point prior to trial, Hawkins' investigator, Wayne Miller, spoke with A.J. over the telephone. Subsequently, at trial, A.J. testified that Hawkins threatened her with a pocket or kitchen knife prior to the rape, by holding it against her neck. She stated that it was more like a kitchen knife and had a pointed end. During cross-examination, A.J. said she did not recall talking to Miller about a week before trial, and denied telling him that the knife was like a folding knife and was closed, rather than open. Transcript of Proceedings (Jury Trial), Vol. I, pp. 89-91.

**[\*P91]** At that point, the State objected because it had not received a copy of Miller's report. Defense counsel indicated that Miller had not made a report; instead, Miller simply told counsel about the conversation. *Id.* at p. 92. The following exchange then occurred:

> MS. DODD [the prosecutor]: Well, you're — under the discovery rules as they exist now —

> MR. CASS [defense counsel]: That I have to make a report?

> MS. DODD: — we're entitled to the information.

THE COURT: That's true. As I, I don't have Rule 16 in front of me but I think that is the gist of it. If it's — but it is quite surprising that she doesn't even remember the phone conversation.

MS. DODD: She remembers the phone [conversation]. She's told us about the phone conversation. I don't know I should —

THE COURT: Well, then you —

MS. DODD: And I, we'll have to talk to her about that. But she does remember the phone conversation.

MR. CASS: I mean I can have him prepare a report for you.

MS. DODD: Well, it isn't going to do me any good now.

THE COURT: How much further are you going to go with what she told Miller?

MR. CASS: I don't know if I have anything else.

THE COURT: All right. If that's the extent of it, it's done. What's done is done and you [the State] can talk about it with her on redirect. Okay?

And — But if Miller's going to testify about it (indiscernible) evidentiary issues regarding that. But if he is, you need a report before he testifies.

MR. CASS: Okay.

Transcript of Trial Proceedings, Vol. I, pp. 92-93.

[*P92] At this time, the only party potentially prejudiced was the State, as it did not have a report from the defense investigator. Subsequently, during redirect examination, the State did question A.J. about the phone call. A.J. then said that she recalled receiving a phone call from an investigator in the last few weeks. She first stated that the individual identified himself as an investigator working for the defendant and then said she thought it was a prosecutor because that is what he said on the phone. *Id.* at pp. 100-102.

[*P93] Miller was then called as a witness during the defense case. Miller explained that he had tried to contact A.J., and that she had actually called him at his office. According to Miller, A.J. brought up the knife issue during their conversation. Her statement was that the knife had a brown handle and was closed. Transcript of Proceedings, Vol. II, p. 343-344.

[*P94] During Miller's cross-examination, the prosecutor stated that "And with respect to [A.J.'s] conversation with you — now that we've moved courtrooms, I have to find your report. Let me find my copy of your report. I moved it when we moved courtrooms." *Id.* at p. 346. The State then cross-examined Miller about his conversation with A.J. and his report. *Id.* at 347-349. In addition, the defense questioned Miller about the conversation with A.J. on redirect examination. *Id.* at pp. 350-351.

[*P95] In light of these circumstances, Hawkins' claim of ineffective assistance of counsel is without merit. Defense counsel was able to impeach A.J. concerning her inconsistent statements about the knife, and was also able to present testimony from the defense investigator during Hawkins' defense case, because Hawkins did produce a report for the State. The record does not indicate that any more could or should have been done.

[*P96] Based on the preceding discussion, we find no evidence of ineffective assistance of counsel. Accordingly, the Fifth (and Second Supplemental) Assignment of Error is overruled.

*State v. Hawkins*, 2018-Ohio-867.

In his Reply, Hawkins argues Cass should have called A.J. at the motion to dismiss hearing because her lapses in memory would have shown the trial judge the needed actual prejudice from pre-indictment delay. As the Second District found, her memory lapses would have benefited Hawkins and in any event the identity of witnesses to call is reserved for trial counsel's discretion.

As to the jury view, Hawkins has shown no prejudice from its occurrence. He does not dispute the findings of the Second District that it was requested by both parties and that his own description of the route he and A.J. took the night of the events was confused. Regarding the omitted subpoena to the Dayton Police Department for telephone records, Hawkins' claim that

they could have been easily produced from ten years earlier is unsubstantiated. Lastly, defense counsel did produce a report from the investigator and the lack of a report in the first instance did not prevent relevant testimony.

In sum, Hawkins has not shown that the Second District's decision on his five specific sub-claims of ineffective assistance of trial counsel is an unreasonably application of *Strickland*. His Fifth Ground for Relief should be dismissed on that basis.


**Ground Six: Denial of Due Process by Trial Court Error**


In his Sixth Ground for Relief, Hawkins claims the trial court denied him a fair trial by allowing the jury view, by cutting his own testimony short, and by violating unspecified Ohio statutes and rules of evidence. The Second District decided this claim on the merits and the Warden concedes it is preserved for merit review here, albeit the review is required to be deferential under AEDPA.

The Second District understood this to be a federal constitutional claim, but found there was no abuse of discretion in allowing the view even though many structures in the area had been torn down. Hawkins pointed to no relevant federal case law in his brief to the Second District and cites none in this Court. A jury view is not evidence under Ohio law and the trial judge correctly instructed the jury to that effect. *State v. Richey,* 64 Ohio St. 3d 353, 367 (1992); *State v. Hopfer*, 112 Ohio App. 3d 521, 542 (1992). Whether to grant a jury view is "within the sound discretion of the trial court." *State v. Lundgren,* 73 Ohio St. 3d 474, 490 (1995), quoting *Calloway v. Maxwell*, 2 Ohio St.2d 128 (1965). But abuse of discretion is not a denial of due process *Sinistaj v. Burt,* 66 F.3d 804, 807-08 (6th Cir. 1995). There is no constitutional right for a defendant to be

present at a jury view. *Snyder v. Massachusetts,* 291 U.S. 97, 108 (1934). Therefore, the Second District's decision on the jury view issue is not an objectively unreasonable application of clearly established Supreme Court precedent and is entitled to deference.

Hawkins also claimed on direct appeal that the trial court had denied him due process and particularly the right to defend himself by cutting short his testimony. As the Second District noted, Hawkins had already left the witness stand when he interrupted the court and asked to say something more. *State v. Hawkins*, 2018-Ohio-867 ¶ 105. His counsel did not seek to reopen his testimony and he does not indicate to what he was prevented from testifying. There is no constitutional right to reopen one's testimony once one has left the witness stand. At trial the judge cut Hawkins off by preventing him from testifying to hearsay, to wit, things said to him by deceased witnesses. There is no constitutional right to present hearsay testimony in one's defense.

The Second District's decision on this issue is also entitled to deference under AEDPA and Hawkins Sixth Ground for Relief should be dismissed.


**Ground Seven:  Prosecutorial Misconduct**


In his Seventh Ground for Relief, Hawkins asserts the prosecutor committed misconduct by withholding exculpatory material required to be produced under *Brady v. Maryland*, 373 U.S. 83 (1963). He also asserts the prosecutor misrepresented the evidence and produced false evidence. In the Petition these claims are made very generally:  he does not state what *Brady* evidence was withheld, what false evidence the State produced, or what evidence the prosecutor misrepresented.

On direct appeal, Hawkins asserted misconduct in the inclusion of an allegation in the

indictment that the victim as under age thirteen or was incompetent. The Second District found this claim forfeited by failure to object to the indictment in the trial court. *State v. Hawkins*, 2018-Ohio-8667, ¶ 112-18.

As to *Brady* material, Hawkins claimed on direct appeal that the State had suppressed the victim's Grandview Hospital records regarding a prior assault and her mental health records. The Second District found that those were not *Brady* material because Hawkins had knowledge of them. The court further found that the records were not suppressed by the State because they had only ever been in the possession of the hospital and had been destroyed pursuant to the hospital's routine records disposition policy. *Id.* at ¶¶ 121-26.

In his Reply, Hawkins complains about improper witness vouching in closing argument and cross-examination which was intended to undermine his credibility (ECF No. 18, PageID 2321). Neither of these claims was raised in the state courts and they are therefore procedurally defaulted. As to *Brady* material, he claims in the Reply that the State is withholding Detective Olinger's case file pertaining to this case. *Id.* at PageID 2322. That claim was also not raised on direct appeal and is thereby procedurally defaulted.

With respect to the *Brady* claims actually made on direct appeal, Hawkins merely repeats his allegations about A.J.'s hospital and mental health records without rebutting the findings of the court of appeals about which entity had possession of them. *Id.* at PageID 2322.

Based on this Court's review, the Second District's decision is not an objectively unreasonable application of *Brady* or of other Supreme Court precedent on prosecutorial misconduct. Therefore, the state court decision is entitled to deference under AEDPA and Ground Seven should be dismissed.

**Conclusion**

Based on the foregoing analysis, it is respectfully recommended that the Petition be dismissed with prejudice. Because reasonable jurists would not disagree with this conclusion, Petitioner should be denied a certificate of appealability and the Court should certify to the Sixth Circuit that any appeal would be objectively frivolous and therefore should not be permitted to proceed *in forma pauperis*.

December 4, 2019.

s/ *Michael R. Merz*
United States Magistrate Judge

**NOTICE REGARDING OBJECTIONS**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by mail. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. A party may respond to another party's objections within fourteen days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140, 153-55 (1985); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).